## DOW v. BRYANT
### (No. 1033; Decided May 23, 1922; 206 Pac. 1061)

JUDGMENT NOTWITHSTANDING THE VERDICT—REQUEST FOR ORDER DIRECTING ENTRY OF JUDGMENT—POWER OF TRIAL COURT TO CONSIDER EVIDENCE AND PLEADING IN DETERMINATION OF RIGHT TO JUDGMENT NON OBSTANTE VEREDICTO—LEASE—DAMAGES—CONSTRUCTION OF CONTRACT.

1. The statute (5897 C. S. 1920) authorizing trial courts in civil actions after the denial of a motion by either party for a directed verdict or a request for an instruction of like effect, to grant a motion of such party ordering the entry of a judgment to the party entitled thereto, clearly authorizes the court to consider the evidence and pleadings in determining whether an order for such judgment should be made.

2. In an action upon a note given for rent wherein defendant counterclaimed for damages to crops alleged to have been caused from a shortage of water, the lease stipulating the land to be rented together with sufficient water from the "L" extension of the R. B. Canal to irrigate the same, held that from the terms of the lease it was apparent that the parties contracted on the basis of the continued existence of sufficient water in a designated canal to meet the irrigation requirements of the land under lease, and not upon a basis of guarantee of a sufficient water supply in any event.

3. Under a lease covenant that lessee should be supplied with sufficient water from a specified canal to irrigate the land described in the lease, failure of the supply in the canal from natural sources relieves the lessor from liability for a failure of a sufficient water supply. The rule would be otherwise had the lease referred to no specific canal.

4. In an action upon a note given for rent wherein defendant counterclaimed for damages to crops alleged to have been caused by a shortage of water from a canal designated in the lease as the source of water supply for the irrigation of the lands under lease, held that in as much as plaintiff was entitled to a directed verdict on her motion which was overruled, the court thereafter properly sustained her motion for a judgment notwithstanding the verdict.

ERROR to the District Court, Big Horn County, P. W. METZ, Judge.

Action by Martin Dow, lessee, against Laura Bryant, lessor, upon a note given for rent in which defendant counterclaimed for damages to crops alleged to have resulted from shortage of water for the irrigation of the lands described in the lease. There was a judgment directed for plaintiff notwithstanding the verdict and defendant brings error. The material facts are stated in the opinion.

*R. B. Landfair,* for plaintiff in error.

Courts are confined to the consideration of the statement in the pleadings in disposing of a motion for judgment notwithstanding the verdict. (4624 C. S. McCoy v. Jones, 61 O. S. 119; Rheinheimer v. Ins. Co., 77 O. S. 372.) There is no provision in the statute authorizing the court to consider the evidence nor any part of the record outside the pleadings, but when the statute restricts the court to the statement in the pleadings, as the Wyoming statute does, there is no authority to consider the evidence. (Lepori v. Mattison, 80 Ore. 354.) The motion will be refused if there be a general denial in the answer. (Manning v. Orleans, 42 Neb. 712; 60 N. W. 953. State v. Commissioners, 7 Wyo. 162.) The contract was absolute and required the delivery of a sufficient volume of water to irrigate the land; drouth was no defense. (Irrigation Co. v. Dodd, 162 S. W. 946; Canal Co. v. McFarland, 94 S. W. 400; Board of Education v. Townsend, 63 High Est. 514.) The act of God cannot excuse a failure to perform. (Reny v. Olds, 34 Pac. 216; Jones v. Proctor, 24 Ohio C. C. Rep. 80.) On appeal from judgment notwithstanding the verdict the Supreme Court cannot look at the evidence. (Aldrich v. Mathias, 141 Ill. App. 594; Commissioners v. Shafner, 10 Wyo. 181; Schlessinger v. Cook, 9 Wyo. 256.) No motion for new trial was necessary. (Butler v. Lawson, 72 Mo. 244.)

*Brome & Hyde,* for defendant in error.

At the time this brief is written there is pending a motion for leave to. withdraw the bill of exceptions for correction and to show that at the close of the evidence plaintiff moved for a directed verdict; that such motion was denied, and exception taken. The trial court directed the entry of judgment notwithstanding the verdict pursuant to the provisions of Section 2897 C. S. 1920. The evidence not being embodied in the bill, the presumption is that the courts action was justified. Plaintiff in error ignores the statute under which the court acted; we concede that in its absence, a judgment *non obstante veredicto* cannot be entered where the pleadings present an issue of fact. The statute which we have cited enables the court to correct an error if any. The parties in contracting knew that water for the irrigation of the land must be obtained from the river through the ditch in question. The parties are bound by what they intended to be bound by. (6 R. C. L. 225.) It was intended that the lands should receive the water to which it was entitled through the canal in question and nothing else. Where performance of a contract becomes impossible by the cessation of the existence of the thing which is the subject matter of the contract, the obligation will be construed as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible by the perishing of the thing without the fault of the promisor. (1916 F. L. R. A., 53. Bruce v. Gas Co., 46 Ind. App. 193; Jackson County v. Independent, 188 Mo. Appeals 157; Land Company v. Harriman, 68 N. H. 74; Ward v. Vance, 93 Pac. 499.) The water in the spring failed on account of drought, and the lessor was held excused under a proper construction of the agreement.

*H. B. Landfair,* in reply.

The contract was positive to furnish land and water without qualification. The rule urged by defendant in error as a basis for excuse has not been uniformly accepted

by the courts. (Berg v. Erickson, 234 Fed. 817.) There was no reason for judging a contract by extrinsic evidence, it being plain and positive on its face. The jury found against the plaintiff. The rule is that where there is a positive contract to do a thing in itself unlawful, the contractor must perform it although in consequence of unforseen accidents the performance has become burdensome or impossible. (Pollack Contr. 362.) Where one of two persons must sustain the loss, the law casts it upon him who has agreed to sustain it, or, rather, the law leaves it where the agreement of the parties has put it. The granting of a judgment by the trial court *non obstante veridicto* should be reversed.

POTTER, Chief Justice.

By a written contract of lease the plaintiff rented to defendant for one year from the first day of March, 1919, certain described land in Big Horn County, "together with sufficient water from the Lewis extension of the R. Bahr Canal to irrigate" the same, for the sum of Five Hundred dollars, "payable December 1, 1919, for which amount Lessee shall give to Lessor his note, dated March 1, 1919, with interest at 6% from date." The note was executed and delivered to plaintiff by the defendant; and this suit was brought upon the note to recover the full amount of principal and interest.

The defendant's answer admits the execution of the note, and alleges as a defense thereto, in substance, that the plaintiff agreed and covenanted to furnish the defendant with sufficient water to irrigate the land; that the amount of water furnished was insufficient, causing the loss of a large part of defendant's crops and a net damage to him of $1997.50, after deducting the alleged value of the use of pasture upon the premises. And judgment was prayed for that amount, less such sum as may be found due to plaintiff.

The plaintiff replied, denying that she agreed to furnish sufficient water to irrigate the land and alleging that when

the lease was executed and prior thereto the plaintiff and defendant both knew that the land could be irrigated only through the canal mentioned in the lease, and that the right with respect to such irrigation was limited by the supply of water obtainable from Greybull river through said canal under a permit issued by authority of the state as provided by law; that the water in said river was abnormally low during the irrigating season of 1919, owing to the absence of sufficient snow in the mountains within the watershed of said river and the absence of rain, resulting, without any fault of plaintiff, in said land and all other land in the watershed of said river being deprived in some measure of the normal supply of water for irrigation purposes; that defendant received through said canal during the said season all the water for irrigation purposes that it was possible to obtain from said river, and all that plaintiff agreed to furnish, and all that defendant expected or was entitled to receive; that the parties had in mind that defendant should receive only such supply of water as might be obtained by means of said canal from said river under said permit, and that he did receive all that was contemplated by the lease. Other matters were alleged in the reply that are not material to the question upon which the cause was determined in the trial court and is now submitted to this court.

The case was tried to a jury, and at the close of the evidence the plaintiff moved that the jury be instructed to return a verdict in her favor for the amount claimed in the petition. That motion was overruled, the plaintiff excepting thereto, and the verdict was for the defendant, assessing his damages in the sum of one dollar. Thereupon plaintiff filed a motion for judgment *non obstante veredicto* upon the ground that upon the pleadings and the evidence the plaintiff was entitled, as a matter of law, to recover the full amount due upon the note sued upon, including interest and attorney's fees. That motion was sustained by the trial court and judgment was ordered and thereupon entered in favor of the plaintiff for the amount so claimed.

The defendant excepted to the ruling sustaining the last mentioned motion and the judgment so ordered and entered, and has brought the case to this court by a proceeding in error, assigning as error the ruling upon said motion and the judgment rendered as the result thereof.

The first contention of counsel for plaintiff in error is that the trial court erred in considering the evidence in the case upon the motion for judgment *non obstante veredicto,* and that such a judgment is authorized only under Section 4624, Comp. Stat. 1910, now Section 5895, Comp. Stat. 1920, which provides that, "when, upon the statements in the pleadings, one party is entitled by law to judgment in his favor, judgment shall be so rendered by the court, although a verdict has been found against such party." That is one of the original sections of our code of civil procedure, and it may be conceded that until 1915 it was the only authority for such a judgment where there was merely a general verdict. But a statute was enacted in that year (L. 1915, Ch. 134), now Section 5897, Comp. Stat. 1920, under which the trial court evidently acted, providing as follows:

"When, in the trial of a civil action, a motion is made by either party that a verdict be directed in favor of such party, or an instruction to that effect is requested, and the motion or instruction is denied, the trial court, on motion of such party for a new trial or for judgment notwithstanding the verdict, may order judgment to be entered in favor of the party who was entitled to have a verdict directed in his favor; and the Supreme Court, in reviewing the judgment upon exceptions and error, may order and direct judgment to be entered in favor of the party who was entitled to have such verdict directed in his favor, whenever it shall appear from the pleadings and evidence that the party was entitled to have his motion or request for a directed verdict granted."

That statute clearly authorizes a consideration of the evidence as well as the pleadings in determining whether a party's motion or request for a directed verdict should

have been granted. And we have recently considered and applied the statute in Union Pac. R. Co. v. Pac. Market Co., 200 Pac. 106, and again in an opinion not yet reported denying a petition for rehearing in that case.

The other contentions of plaintiff in error relate to the issue presented by the answer and reply concerning the provision of the lease declaring the land to be rented "together with sufficient water from the Lewis extension of the R. Bahr canal" to irrigate the same. And the principal question presented upon that issue is whether under that provision the lessor was obligated to furnish sufficient water to irrigate the land, regardless of any lack of supply of water for said canal through the natural causes stated in the reply and shown by the evidence and without the lessor's fault. It is contended by the plaintiff in error that the provision amounted to an absolute and unqualified agreement on the part of the lessor to furnish sufficient water throughout the irrigation season, in the absence of any other provision in the lease limiting the lessor's liability in the event of a shortage of water in the source of supply. And it is contended on the other hand that since the contract provides only for the furnishing of water through a particular canal, the lessor was required to furnish water to the extent only that it was obtainable through said canal from the Greybull river, which was its only source of supply; and that the fact that it became impossible to obtain sufficient water during the latter part of the irrigation season because of the shortage of water in the source of supply excused further performance on the principle that the continued existence of sufficient water in the river to supply the ditch with the water appropriated for the land was an implied condition of the contract, and that no express provision was necessary limiting liability in the contingency which arose.

The evidence shows without dispute that the failure to furnish sufficient water throughout the entire irrigation season was caused solely by the shortage of water in the Greybull river, the only source of supply for the ditch men-

tioned in the lease and for the irrigation of the land, that
all the water that could be obtained from said river through
said canal during the season covered by the lease was re-
ceived and used; and that the water so supplied was suf-
ficient during the early part of the season. It appears
also that both parties at the time of the making of the con-
tract knew the source from which and the means by which
water for irrigating the land must be obtained and sup-
plied, namely, the said river and the canal mentioned in
the lease; and that both understood that there was a possi-
bility that there would not be a normal or sufficient supply
obtainable that year. The defendant had lived in the neigh-
borhood of the land for 18 years or more, and he testified
that he had known the land for that period, the source from
which the water for its irrigation was obtained and the
ditch through which it was supplied, and that he had told
the lessor before the lease was signed that he thought there
would be a shortage of water. He testified also that he
knew that water to irrigate the land could not be obtained
except from the Greybull river. The evidence shows also
that the plaintiff had received $650 from another party for
the rent of the land the preceding year, and she testified
that at first she asked that sum from the defendant but
that upon his refusing to pay more than $500, and stating
that there might be a shortage of water, she agreed to lease
it to him for that sum in view of such prospect for a
shortage of water, provided he would agree to do the ditch
work, which we understand to have meant the necessary
cleaning out of the ditches. Upon that subject the defend-
ant testified that the said reduction in the rent was in con-
sideration of his agreement to do the ditch work. He had
testified upon his direct examination that when he was
negotiating for the lease he told the plaintiff that he was
afraid the water would be short and he would not rent the
place unless she would agree to furnish sufficient water, and
that she said that it was in the lease that she was to fur-
nish the water. The defendant denied that she made any
such statement, but testified when asked about it that

"there wasn't a word said about that, he could read as well as I, and we both understood that this land was to be watered from the amount of water that the state had appropriated for this land and no more." She also testified that the lease was drawn up after the conversation between the parties with reference to the amount of the rent and the possibility of a scarcity of water. It appears also from the evidence that the plaintiff's water right priority for the land was No. 56 in the order of priority of rights to water from the stream.

We think that the slight conflict in the testimony above related is unimportant, for if the plaintiff stated that it is in the lease that she is to furnish the water that could have meant no more than what is stated in the lease or what is to be understood from the provision to which the reference was made; and certainly whether a possible or probable scarcity of water was one of the reasons for reducing the rent or whether such reduction was solely in consideration of the lessee's agreement to do the ditch work cannot affect the construction of the contract. In view of the surrounding circumstances which must be considered to ascertain the intention of the parties, we think that the case clearly comes within the general principle which we find stated in *Corpus Juris* (13 C. J. 643) as follows:

"Where the contract relates to the use or possession or any dealing with specific things in which the performance necessarily depends on the existence of the particular thing, the condition is implied by law that the impossibility arising from the perishing or destruction of the thing, without default in the party, shall excuse the performance, because from the nature of the contract it is apparent that the parties contracted on the basis of the continued existence of the subject of the contract."

The principle is stated in a leading English case on the subject, Taylor v. Caldwell, 32 L. J. Q. B. 164, 6 Eng. Rul. Cas. 603, as follows:

"There seems no doubt that where there is a positive contract to do a thing, not in itself unlawful, the contractor

must perform it or pay damages for not doing it, although in consequence of unforeseen accidents the performance of his contract has become unexpectedly burthensome or even impossible. * * * But this rule is only applicable when the contract is positive and absolute, and not subject to any condition either express or implied; and there are authorities which, as we think, establish the principle that where, from the nature of the contract, it appears that the parties must from the beginning have known that it could not be fulfilled, unless when the time for the fulfillment of the contract arrived, some particular specified thing continued to exist, so that, when entering into the contract, they must have contemplated such continued existence as the foundation of what was to be done; there, in the absence of any express or implied warranty that the thing shall exist, the contract is not to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing without default of the contractor. There seems little doubt that this implication tends to further the great object of making the legal construction such as to fulfill the intention of those who entered into the contract. For in the course of affairs men, in making such contracts, in general would, if it were brought to their minds, say that there should be such a condition.''

And the principle is thus established clearly upon the theory that under the conditions mentioned the means of performance have ceased to exist without the fault of the promisor. For example, in Dolan v. Rodgers, 149 N. Y. 489, the court say:

''There are many cases holding that the continued existence of the means of performance, or of the subject matter to which the contract relates, is an implied condition, and the rule seems to rest upon the presumption that the parties necessarily intended an exception, and, as said in Dexter v. Norton, supra (47 N. Y. 62) it operates 'to carry out

the intention of the parties under most circumstances, and is more just than the contrary rule.' ''

And in Shear v. Wright, 60 Mich. 159, it is said: ''While a contract may be so framed as to make the contracting party 'absolutely bound in all events, yet such is not the universal rule. In the present case the services agreed upon could not be rendered under the contract unless one or the other of the two animals could be had for the purpose. Their continued existence entered into the consideration of both parties as an indispensable element of performance. This being so, and there being nothing in the contract to provide a substituted performance as within the design, the case seems to fall within the rule that under such circumstances the existence of the means of performance is a condition without which, in the absence of fault, there can be no liability. This doctrine is very clearly stated in 2 Chit. Cont. (11th Ed.) 1070-1078 and the citations. The doctrine is reasonable and assumes that both parties become interested in the continued existence of the subject of the condition.

The rule has been held applicable in several cases involving contracts for the furnishing of water for irrigation. Acom v. Frye, 55 Colo. 56, 132 Pac. 55, is a case closely in point. There was a written lease of a section of farming land in that case whereby the lessor agreed to furnish 105 inches of water for irrigation. The lessee was plaintiff in the action and alleged that the defendant, the lessor, neglected, refused and failed to furnish that, or any, amount of water for the irrigation of the land, which prevented him from raising an average crop, to his damage. The court said as to the facts in substance, that the lessee, prior to leasing the premises, was informed that the water used for irrigating the farm was obtained from the High Line Ditch; that he made inquiries regarding the source of the water, and was informed by the prior tenant that the ditch water for irrigating the place came from that canal; and that he knew before he signed the lease that the quantity agreed to be furnished was to be taken from that canal..

And upon those facts, the court said:

"It is a matter of common knowledge, about which there ought to be no controversy, that farming in this arid region can only be successfully prosecuted by means of irrigation. Our Constitution declares the water of every natural stream to be the property of the public, dedicated to the use of the people, and that priority of appropriation gives the better right to this use. Plaintiff knew that the ditches on the river, had different priorities, and that in policing the stream in times of scarcity the officers would close their river headgates in the order of their priorities. It is not claimed that Frye was a stranger, unacquainted with the conditions and surroundings under which the lease was made, or that any concealment, deception, or fraud was practiced upon him relative to the water available for irrigation. He was informed by others, and knew from his investigations, that the water to irrigate this farm came from one of the large irrigation canals operating in that community, and he was bound to take notice that it would take its supply in the order of its priority to the extent that there was water in the stream sufficient to supply its appropriation. It seems to be the theory of plaintiff that there is an express guaranty in the lease that Acom would supply him a constant flow of 105 inches of water, regardless of whether it was in the canal or could be obtained from the river. There is no such guaranty in the lease, so it is useless to discuss what would be the effect of such a provision. Whenever water in natural streams is scarce, ditches can deliver in the order of their priority only, and while a ditch is 'shut out' it of course is unable to deliver any water to its consumers. This custom and law controlling irrigation in this state was in the minds of both contracting parties when they made the lease, and will be read into it as constituting a part of the contract."

Thus, in that case, it was held to the contrary of the contention of the plaintiff in error that a provision like that in the case at bar, but even stronger because stating the quantity of water to be furnished, and evidently with-

out designating the supply ditch, is to be understood as a guaranty that sufficient water will be furnished.

The similarity of the facts in that case to those in the case at bar, as well as the similarity in the law governing the appropriation and use of water for irrigation with reference to which the case was decided, renders it strongly applicable as an authority in the case at bar, justifying, we think, the extended quotation from the opinion.

The principle has been recognized also in Oregon and Washington with reference to contracts to furnish or deliver water, though in the cases to be cited from those states stating the rule, the facts were held insufficient to justify its application. Thus, in a case involving the lease of a water power, it was said in Pengra v. Wheeler, 24 Ore. 532, 34 Pac. 354, 21 L. R. A. 726:

"It is a well recognized principle of law, that when it is apparent that the parties have contracted on the basis of the continued existence of a given thing, then, on performance becoming due, if, without the fault of the parties, the thing has ceased to exist, the case has become one of mutual mistake and the duty to perform no longer remains. (Bish. Cont. § 588; Chit. Cont. § 1070.) The contract in the case at bar relates to the lease of a water power. The injury to the dams and race was not a destruction of the power, which continued to exist after the flood. * * * If the stream had, in consequence of drought, failed to furnish the necessary amount of water to operate defendant's mills, this would have been a destruction of the subject-matter of the contract, and would have excused performance."

In a later Oregon case, (Anderson v. Adams, 74 Pac. 215), which was an action for damages for failing to furnish water for irrigation, the court quoted from Pengra v. Wheeler, supra, the above statement of the general principle, and then said, in disposing of an exception to a ruling excluding evidence to show the relative difference in elevation between old and new ditches for carrying water to leased lands:

"Whether or not the drought of 1898 so affected the body of water from which the demised tract of land was to be irrigated as to cause the source to cease to exist, does not appear from inspection of the bill of exceptions, and the question so objected to appears only to go to the practicability of irrigating the leased land by means of a particular ditch. * * * The question relating to the difference of elevation of the respective ditches, and the statement of defendant's counsel of what they expected to show if the witness was permitted to answer the question propounded to him, do not tend to show that the source of the water was wholly exhausted so as to render the irrigation of the land physically impossible; and for this reason the act of God is not involved, and no error was committed in sustaining the objection to the question asked."

And in Evans v. Prosser Falls L. & P. Co., 62 Wash. 178, 113 Pac. 271, where it was held that, notwithstanding a diminution of the natural flow of the water in the stream, there would have been sufficient water, had it not been diverted for another purpose by the party contracting to furnish it and therefore that the latter was liable for the failure to furnish the quantity contracted for, the court said:

"The evidence, does, indeed, tend to show that the natural flow of water in the Yakima river was materially reduced during the dry season of the years mentioned, and, were this fact the sole cause of the shortage available for the canal, we think it could be held to be so far an act of God within the meaning of the contract as to excuse the want of performance of the contract. * * * The respondents contracted with reference to the natural flow of the stream, not with reference to such part of it as the appellant was saving from the flow, and they have the right to insist that the entire quantity so flowing and over which the appellant had control at the time their contracts were entered into, be turned into the canal, if so much be necessary to furnish them with the quantity for which they contracted."

In Fresno Milling Co. v. Fresno Canal & Irr. Co., 126
Cal. 640, 59 Pac. 140, wherein the plaintiff had sued for
damages for the breach of two contracts for the sale of
water, it appeared that the defendant had contracted to
supply the water from an open canal constructed in part
upon a public street in the city of Fresno and in part upon
a county highway; that the road overseer of the county,
under directions of the supervisors, filled in the canal upon
the county highway and levelled the road to its grade, and
thereafter the portion of the canal within the city was
likewise filled, destroying its character as a canal. The
trial court found that the canal company had faithfully
performed the contract when not prevented by obstruc-
tion or force that could not be overcome by the use of due
and every possible diligence on its part. That finding being
assailed in the appellate court, upon the ground that it
was defendant's duty to have maintained a suitable canal
and one which would not have interfered with the right of
the public upon the highways, and that if it had done so,
there would have been no interference with its use of the
water, the court said:

"But it may be answered that, viewing the contract in
the light of the circumstances under which it was made, and
bearing in mind further that the defendant's agreement
went but to the supplying water from a given named canal,
it is reasonable to conclude, as the trial court must have
done, that defendant was to supply the water from this
particular canal, so long as it was permitted to do so, and
that it was not within the contemplation of the parties that
the entire construction of the canal should be changed, as
would have been necessary to prevent either an anticipated
interference with its use, or to enable it to continue to sup-
ply the water should such interference take place."

The principle appears to have been applied in the Penn-
sylvania case of Ward v. Vance, 93 Pa. St. 499. That was
an action substantially for damages alleged to have been
caused by the failure of Ward to supply a hotel with water
according to an agreement in a lease under which Vance

held the premises. It appeared that the agreement was: "to furnish and supply the Ward House * * * with spring water, so long as the said John O. Ward, his heirs or assigns, may desire to have the same furnished and supplied, said water to be conveyed and supplied with the same, and by and through the same pipes and faucets which are now used for the same purpose or by and through other pipes and faucets of the same dimensions." That agreement was made between C. L. Ward and John O. Ward. Afterward John O. Ward leased the premises to parties who assigned it to Vance, the plaintiff. That lease provided, "that said Ward House is to be supplied with spring water during said term in the manner the same is now supplied under that certain agreement," between C. L. Ward and John O. Ward. It further appeared that the spring from which the water was conveyed had been the only regular source of supply for the hotel since it was built, and that shortly after Vance took possession of the premises the supply of water became insufficient. The court said:

"Here is an express stipulation in reference to water supplied by the pipes that led from the house to the spring and in operation and that the lessee should have its use during the term, 'to be furnished and supplied with the same and by and through the same pipes and faucets which are now used for said purpose, and by and through other pipes and faucets of the same dimensions.' If the water failed because of drought and other natural causes, which neither party could prevent, it was no breach of any covenant, express or implied, for its supply. The lessor did not undertake to lay pipes to other fountains and furnish water in any other way than as supplied at the time of making the contract. He did not agree to furnish water in case drought dried that spring. We are of opinion it was error to instruct the jury that he was bound to supply water equal to the supply in 1871 whether the spring kept up or not."

The Texas cases of Northern Irr. Co. v. Dodd, 162 S. W. 946, and Northern Irr. Co. v. Watkins, 183, S. W. 431, cited

by plaintiff in error, are distinguishable upon principle from the case at bar for the reason that the contract in each of those cases provided for the payment of a stipulated amount of damages per acre if there should be a failure to furnish sufficient water. But it was said in the Dodd case that it did not appear that it was a physical impossibility for appellant to comply with its contract on account of the failure of the water in the Colorado river, which it would be necessary to show in any event, in order to excuse appellant on account of drought; that it is no answer to say that to have obtained the necessary water from any other source would have been very expensive, since "appellant had the option under this contract to either incur such additional expense or to pay the damages not exceeding $4.00 per acre."

Another case, also distinguishable from the case at bar upon the facts, is Smith v. Hicks, 14 N. M. 560, 98 Pac. 138. In that case the water was to be furnished "from an artesian well located on the land:" The well had not been completed when the lease was entered into, but the lessor's contractor was proceeding with the work, and when the final flow of water was struck, shortly after the crops had been planted, the contractor locked up the well so that the lessee could not get water from it, explaining that he had to do it to get a settlement with the lessor. The lessee protested and threatened to break the lock, whereupon he was told by the contractor that he would do so at his peril. The court said that if, after the well was brought in, the contractor had permitted the water to run for a time, and the lessee had been permitted to use it, thus obtaining possession thereof, the act of the contractor in locking the well would have been a trespass against which the lessee would have been charged with the duty of defending his possession, and further:

"The defendant had put Fisher in possession of the well under a contract to which Smith was not a party, and this contract gave Fisher a right to be upon the premises superior to that of Smith himself, as this right existed when

the lease was executed. Fisher refused to allow the well to flow for the use of Smith, and immediately locked the well. Smith protested to the extent of threatening to break the lock and take the water, but without effect.     *     *     * The water was to be furnished for the use of the plaintiff in raising crops, and was not furnished, when, to obtain possession and use of it, the plaintiff would be required to incur personal danger or become involved in litigation. · Smith was not the agent of Hicks in regard to the sinking or paying for this well. Fisher was in possession with a claim of right, and in our opinion the plaintiff was not required to do more than he did to obtain the water.''

The principle upon which the case must be decided is recognized in Weil on Water Rights, 3rd Edition, wherein it is said (§ 538) :

''A contract being to supply water from a specific canal, failure of the supply in the canal from natural causes relieves the canal owner from liability for the failure to supply the water, and is not failure of consideration such as to allow recovery of advance payments; but it would be otherwise where the contract referred to no specific canal.'' (See also R. & M. Irr. Co. v. Brumbaugh, 81 Nebr. 641, 116 N. W. 512; Duson v. Dodd, 46 Tex. Civ. App. 140.)

The principle is recognized and applied also in numerous cases involving contracts relating to various other subjects. For example: An executory contract for the sale of specific piles of lumber, or lumber to be cut from specified logs, or from timber upon specified land. (McMillan v. Fox, 90 Wis. 173; International Paper Co. v. Rockefeller, 161 App. Div. 180; Dixon v. Breon, 22 Pa. Super. Ct. 340; Switzer v. Pinconning Mfg. Co., 59 Mich. 488.) A contract to drive logs down a certain stream, where the water in the stream fell, making performance impossible. (Clarksville Land Co. v. Harriman, 68 N. H. 74, 44 Atl. 527.) A contract to furnish natural gas. (Bruce v. Ind. Gas Co., 46 Ind. App. 193; Jackson County L. H. & P. Co. v. Independence, 188 Mo. App. 157.) It is said in the Indiana case cited that ''if performance depended on the continued existence of natur-

al gas, and there is no provision in the contract for a sub stituted performance, 'the existence of the means of performance is a condition without which, in the absence of fault, there can be no liability.' '' And where the contract was to deliver a specified quantity of potatoes to be grown on certain land, and the crop was largely diminished by disease, "which no skill or care on the part of the defendants could have prevented," it was held the party was excused from delivering the agreed quantity. (Howell v. Coupland, 33 L. T. 832.) Lord Coleridge, C. J., said in that case: "It appears to me that the true ground of construction on which this contract should be interpreted, and I believe the ground on which the Court of Queen's Bench have decided, is that by the clear and simple construction of the contract both parties agreed there should be a condition that the potatoes should be or have been in existence at the time named for the performance of the contract. They had been in existence and had been destroyed by causes over which the defendant had no control, and therefore it became impossible for him to perform his contract, and according to the law in such case, as applicable to the condition both parties agreed to be bound by, he is excused. It was not an absolute contract to deliver under all circumstances, but it was a contract to deliver a certain quantity of potatoes of a specific crop, and if at the time of delivery such quantity is not forthcoming through reasons over which the defendant has no control, such condition will exempt the defendant from performance of the contract."

For the reasons stated, we are of the opinion that the plaintiff was entitled to have a verdict directed in her favor upon her motion to that effect, and that the court properly thereafter sustained her motion for a judgment notwithstanding the verdict. And the judgment so rendered will be affirmed.

*Judgment affirmed.*

KIMBALL, J., and BLUME, J., concur.